ALDISERT, Circuit Judge.
This appeal by Carl Kipp Olsen from summary judgments in favor of Appellees Officer Bradley J. King, Layton City and Davis County requires us to examine whether the district court properly shielded a police officer and two municipalities *1309 from an obsessive-compulsive disorder sufferer’s 42 U.S.C. § 1983 claims. More specifically, we must determine whether the district court erred in: 1) granting summary judgment on the basis of qualified immunity to Appellee Officer King on Appellant’s Fourth Amendment unlawful arrest and excessive force claims; and 2) granting summary judgment on the basis of qualified immunity to Officer King on Appellant’s Eighth Amendment claim for deliberate indifference to a serious medical need- — namely, a panic attack sparked by his obsessive-compulsive disorder (“OCD”). Additionally, we must decide whether the district court correctly granted summary judgment to Appellee Layton City based on the absence of an underlying constitutional violation, and to Appellee Davis County based on the absence of an unconstitutional policy regarding a failure to train on, or the deliberate indifference, to Appellant’s OCD.
The district court had jurisdiction of the underlying action pursuant to 28 U.S.C. §§ 1331 and 1343. The appeal was timely under Rule 4, Federal Rules of Appellate Procedure. This court has jurisdiction pursuant to 28 U.S.C. § 1291.
I.
A.
Carl Kipp Olsen took his two teenage sons shopping at Layton Hills Mall on December 7, 1997. At the Copper Rivet apparel store, Appellant tried to charge $114.46 worth of items with his Guitar City corporate Visa credit card. Because Copper Rivet’s electronic card reader could not process the card, store clerk Cassie Gregg manually entered the card’s data. After punching in the account number correctly, Gregg had inadvertently entered the wrong expiration date. Although the Visa card was valid and had not expired, the computer reader nonetheless declined it because of the clerk’s typing error — the reason for rejection unbeknownst to either the Appellant or the clerk at the time of the attempted transaction.
Appellant then tried to charge the items with a Discover Card credit card bearing the name of his father Clair Olsen, who had previously authorized him to use the card. Appellant was unaware that his mother Donna Olsen had asked for a new card to be issued because of prior billing concerns. The clerk called Discover Card directly to authorize the account, but Discover Card informed her that Appellant was using the card fraudulently and that she should confiscate it. After Donna Olsen had complained about several unauthorized charges in 1996, Discover Card had in fact improperly listed the account as “fraudulent” without notifying or obtaining her or Clair Olsen’s consent. Instead of retaining the Discover card, the clerk returned it to Appellant, who advised her that he would return with a personal check to pay for the purchases.
While Appellant was en route from the Layton Hills Mall to his home and back again, the Copper Rivet clerk contacted mall security about Appellant’s attempted fraudulent credit card use. Mall security asked the clerk to notify them if Appellant returned to the store. About 30 minutes later, Appellant and his two sons indeed came back to the Copper Rivet, and Appellant paid for the items with a personal check. The store clerk nonetheless contacted mall security during the transaction. When Appellant tried to leave the mall with his merchandise and a receipt, mall security guards stopped him for allegedly using a fraudulent Discover card and held him without incident until the police arrived.
Layton City Police Officer Bradley King responded to the call. Upon arriving on *1310 the scene, Officer King spoke to mall security guard Cindy Tanner, who told him that Appellant tried to use fraudulently the Discover card at the Copper Rivet. Officer King asked that Appellant turn over the credit card. Protesting that he had done nothing wrong, Appellant initially refused but ultimately complied. He also demanded to see Officer King’s supervisor. Without conducting an investigation of his own, Officer King placed Appellant under arrest based on the information that he had gathered. Appellant was charged with fraudulent use of a financial transaction card, possession of a stolen card, and interference with an arresting officer. Notably, Officer King tacked on this last charge immediately before he effectuated the arrest.
Officer King then attempted to handcuff Appellant, whose “muscles automatically tensed up” at the physical confrontation. Supplemental Appendix at 2. Although Officer King claims that he merely “maneuvered [Appellant] against a storefront window [to] gain[ ] the necessary leverage to handcuff him,” App. at 216, Appellant contrarily contends that Officer King used excessive force when he shoved Appellant “a good 10, 12 feet,” “slamm[ing him] up against the glass” of a store window. Id. at 173. Appellant also alleges that Officer King then pulled his arm behind his back in an awkward position in order to handcuff him, threatening to “take [him] to the ground” if he resisted. Id. at 172. Appellant claims that he never physically resisted during the exchange. Id. at 172-173.
Having successfully handcuffed Appellant, Officer King publicly led him through the mall to the Copper Rivet, where Officer King questioned Cassie Gregg about Appellant’s use of the Discover card. At the store, Officer King also telephoned the Discover Card office and spoke to Heidi Crocker, who told him that their records listed the card as stolen. Appellant repeatedly asked Officer King to telephone his parents in Bullhead City, Arizona, to verify that the card was not fraudulent. Officer King refused to try to contact them, reasoning that he would be unable to determine whether the voices on the other end of the line were indeed Appellant’s parents. Officer King did not inquire whether Appellant had paid for or received the Copper Rivet items.
Officer King brought Appellant to his squad car to take him to the Farmington City (Davis County) Jail. Appellant, who suffers from a medically diagnosed condition of obsessive-compulsive disorder (“OCD”), alleges that he had a panic attack en route to the jail and informed Officer King, but that King neglected to address Appellant’s two pleas for assistance. App. at 176. Officer King could not recall whether Appellant mentioned anything about a panic attack. App. at 218.
Once at the Davis County facility, Appellant indicated on a medical screening sheet and told prebooking officers that he had OCD and required medication to stave off panic attacks. App. at 268. Prebook-ing officers erroneously noted on the sheet that he suffered from “CDC.” Id. Davis County jail officers took Appellant’s medication from him and insisted — per search procedure — that he remove his shoes and socks. Appellant recoiled at the request, refusing because of a fear of contamination from the dirty floor. Ultimately, Appellant acceded to the demand, but incurred another panic attack in the process. Id. at 178, 280. The prebooking officers also forced Appellant to be fingerprinted without heeding his concerns about cleanliness. Neither Layton City nor Davis County provides any training for handling individuals diagnosed with OCD. Id. at 275, 361-364. Davis County booking procedures incorporate an intake screening procedure *1311 for undefined mental illness or “psychiatric disorders,” Id. at 361-364, but allow “health trained correctional deputies” to use their discretion in dealing with sundry “mental disorders.” Id. at 283.
While Appellant was in custody, his parents called the jail to advise the officers about his OCD condition and the possibility of attacks. Learning that the officers had ignored Appellant’s requests for aid and withheld medication from him, the Ol-sens called Discover Card to resolve the matter. Discover Card informed the Ol-sens that the company did not know of any fraudulent activity and that no holds had been placed on the card. Officer King’s supervisor, Officer Steven Brown, learned the same information when he finally called Discover Card himself. Appellant posted a $2,950 bond and bailed out of jail immediately before the charges had been dropped.
B.
Alleging violations of their Fourth and Eighth Amendment rights, Appellant and his parents filed suit under 42 U.S.C. § 1983 in the district court against Defendants Layton Hills Mall; The Copper Rivet, Inc.; Novus Corp./Diseover Card; Cassie Gregg; I.P.C. International Security Corporation; Davis County; Layton City; and Layton City police officers Bradley King and Steven Brown. All Defendants filed Motions for Summary Judgment. Appellant and his parents settled with No-vus Corp./Discover Card. The district court granted the remaining Defendants’ Motions for Summary Judgment on June 4, 2001. Appellant and his parents filed Motions for Reconsideration' on June 14, 2001, and June 25, 2001 — both of which the district court denied on June 29, 2001. Meanwhile, Appellant and his parents filed a timely pro se Notice of Appeal on June 26, 2001. Appellant pursues the appeal without his parents, and he brings it only against Officer King, Layton City and Davis County.
C.
Appellant contends that the district court erred in granting summary judgment to Officer King based on qualified immunity because the record is replete with unresolved issues of material fact pertaining to the immunity analysis. He also argues that the district court improperly granted summary judgment to Layton City because Appellant may well convince a jury that Officer King’s conduct was the predicate act underpinning a constitutional claim against the municipality for a failure to properly train police officers. Finally, Appellant contends that summary judgment in favor of Davis County was improper because a jury must decide whether the absence of procedures relating to OCD sufferers may amount to a deliberate indifference to a serious medical need.
II.
This court reviews the legal issues surrounding the grant of summary judgment based on qualified immunity de novo, considering all evidence in the light most favorable to the nonmoving parties under Rule 56(c), Federal Rules of Civil Procedure. DeSpain v. Uphoff, 264 F.3d 965, 971 (10th Cir.2001). Summary judgment is ultimately appropriate when there is “no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law.” Oliver v. Woods, 209 F.3d 1179, 1184 (10th Cir.2000).
This court, however, “review[s] summary judgment orders deciding qualified immunity questions differently from other summary judgment decisions” because of the purposes behind qualified im *1312 munity. Holland v. Harrington, 268 F.3d 1179, 1185 (10th Cir.2001). When a § 1983 defendant raises the defense of qualified immunity on summary judgment, the burden shifts to the plaintiff to show that 1) the official violated a constitutional or statutory right; and 2) the constitutional or statutory right was clearly established when the alleged violation occurred. Farmer v. Perrill, 288 F.3d 1254, 1259 (10th Cir.2002). First, “[tjaken in the light most favorable to the party asserting the injury, do the facts alleged show the officer’s conduct violated a constitutional right?” Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). If so, we must subsequently ask “whether the right was clearly established.” Id. If the plaintiff does not satisfy either portion of the two-pronged test, the Court must grant the defendant qualified immunity. Gross v. Pirtle, 245 F.3d 1151, 1156 (10th Cir.2001). If the plaintiff indeed demonstrates that the official violated a clearly established constitutional or statutory right, then the burden shifts back to the defendant, who must prove that “no genuine issues of material fact” exist and that the defendant “is entitled to judgment as a matter of law.” Id. In the end, therefore, the defendant still bears the normal summary judgment burden of showing that no material facts remain in dispute that would defeat the qualified immunity defense. Farmer, 288 F.3d at 1259. When the record shows an unresolved dispute of historical fact relevant to this immunity analysis, a motion for summary judgment based on qualified immunity should be “properly denied.” Salmon v. Schwarz, 948 F.2d 1131, 1136 (10th Cir.1991) (applying the qualified immunity analysis in the context of a closely related Bivens action, in which material facts relating to the violation of a constitutional right were in dispute at the summary judgment stage).
III.
A.
A police officer violates an arrestee’s clearly established Fourth Amendment right to be free of unreasonable seizure if the officer makes a warrantless arrest without probable cause. Tenn. v. Garner, 471 U.S. 1, 7, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). In the context of a warrantless arrest in a § 1983 action, this court must grant a police officer qualified immunity “if a reasonable officer could have believed that probable cause existed to arrest the plaintiff.” Romero v. Fay, 45 F.3d 1472, 1476 (10th Cir.1995). “Probable cause exists if facts and circumstances within the arresting officer’s knowledge and of which he or she has reasonably trustworthy information are sufficient to lead a prudent person to believe that the arrestee has committed or is committing an offense.” Id. (quoting Jones v. City & County of Denver, 854 F.2d 1206, 1210 (10th Cir.1988)). Although the court may determine whether probable cause existed at the time of the arrest by taking into account factors such as whether the officer reasonably interviewed witnesses readily available at the scene, whether he investigated basic evidence or whether he inquired if a crime had been committed at all before invoking the power of warrantless arrest and detention, none of these factors is dispositive or indeed necessary to the inquiry. The primary concern is whether a reasonable officer would have believed that probable cause existed to arrest the defendant based on the “information possessed by the [arresting] offic[er].” Id. (quoting Anderson v. Creighton, 483 U.S. 635, 643, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). When there are unresolved disputes of historical fact relevant to whether the officer had probable cause and to what information he possessed — and thus to *1313 whether he may properly claim qualified immunity, a court may not grant summary judgment based on qualified immunity because the officer would not have shown that no genuine dispute exists as to material fact. Farmer, 288 F.3d at 1259.
A decade-old case makes plain that we will not grant a defendant official qualified immunity if material facts are in dispute. In Salmon v. Schwarz, 948 F.2d 1131 (10th Cir.1991), we confronted an assertion of qualified immunity by an FBI agent arising out óf a Bivens action. FBI Special Agent Arturo Gonzalez applied for a warrant for the arrest of Margarito Salmon, an alleged narcotics trafficker, based on a set of intercepted phone calls to a “Margarito” whose last name was unknown in a complex scenario involving two different “Margaritos.” Id. at 1139. Because “the facts ..., considered collectively, presented] an incomplete picture of the circumstances relevant as to whether probable cause existed for Salmon’s arrest,” we denied the agent’s motion for summary judgment on qualified immunity grounds. Id. at 1137.
Although “denying] summary judgment any time a material issue of fact remains on [a Fourth Amendment] claim ... could undermine the goal of qualified immunity to ‘avoid excessive disruption of government and permit the. resolution of many insubstantial claims on summary judgment,’ ” Saucier, 533 U.S. at 202, 121 S.Ct. 2151 (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)), the case before us is not one in which Appellant asserts that the sun rises in the west and demands a jury trial to resolve the issue. It is Officer King’s submission that he based his probable cause determination on information obtained from a mall security guard and from his call to Discover Card before he effectuated an arrest. Appellant tells a different story. He testifies that Officer King arrested him as soon as he handcuffed him — that is, before he made any reasonable investigation into whether Appellant had fraudulently used the card. Indeed, Officer King concedes that he spoke to mall security guards and that he “decided to take [Appellant] into custody so [he] could investigate [the allegations] further and get a hold of the credit card.” App. at 214. Appellant asserts that Officer King did not even ask him if he had in fact paid for the merchandise or had a receipt. Officer King says that he does not recall even seeing the merchandise, much less asking about the end result: Appellant contends that Officer King could have ended (or, more appropriately, begun) the inquiry with a call to Appellant’s parents in Bullhead City; Officer King says that his conversations with the mall security guard and the Discover Card representative gave him all the information he reasonably needed to arrest Appellant.
The bottom line is that the district court failed to take into account several disputed factual issues in granting summary judgment on the basis of qualified immunity to Officer King on Appellant’s two Fourth Amendment claims. The parties do not even agree on when the arrest took place — before or after King spoke to the store clerk. The court ignored significant factual differences that render it impossible to make an initial determination as to whether Officer King violated Appellant’s constitutional right to be free from unreasonable seizure. Because we believe that a jury must resolve disputed facts, the court erred in granting judgment on qualified immunity grounds as to the unlawful arrest claim.
B.
A police officer violates an arrestee’s clearly established Fourth Amend *1314 ment right to be free of excessive force during an arrest if the officer’s arresting actions were not “ ‘objectively reasonable’ in light of the facts and circumstances confronting [him].” Graham v. Connor, 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); Cruz v. City of Laramie, 239 F.3d 1183, 1188 (10th Cir.2001). This court assesses the reasonableness of an officer’s conduct “from the perspective of a reasonable officer on the scene,” acknowledging that the officer may be “forced to make split-second judgments” in certain difficult circumstances. Medina v. Cram, 252 F.3d 1124, 1131 (10th Cir.2001) (quoting Graham, 490 U.S. at 396-397, 109 S.Ct. 1865). This reasonableness standard — which is “clearly established” for the purposes of § 1983 actions, Wilson v. Meeks, 52 F.3d 1547, 1552 (10th Cir.1995)—implores the court to consider factors including the alleged crime’s severity, the degree of potential threat that the suspect poses to an officer’s safety and to others’ safety, and the suspect’s efforts to resist or evade arrest. Medina, 252 F.3d at 1131. Because the reasonableness inquiry overlaps with the qualified immunity analysis, “a qualified immunity defense [is] of less value when raised in defense of an excessive force claim.” Id. (citing Quezada v. County of Bernalillo, 944 F.2d 710, 718 (10th Cir.1991). Whether an officer acted reasonably in using deadly force is “heavily fact dependent.” Romero v. Board of County Comm’rs, 60 F.3d 702, 705 n. 5 (10th Cir.1995) (quoting Wilson, 52 F.3d at 1553).
Consequently, this court will not approve summary judgment in excessive force cases — based on qualified immunity or otherwise — -if the moving party has not quieted all disputed issues of material fact. Allen v. Muskogee, 119 F.3d 837, 840-842 (10th Cir.1997). In Zuchel v. Spinharney, 890 F.2d 273 (10th Cir.1989), we agreed that a district court could not justifiably pin a grant of summary judgment on qualified immunity while disputed material facts remained as to whether an officer behaved in an “objectively reasonable” fashion in shooting and killing a man. Specifically, we affirmed the district court’s denial of a police officer’s motion for summary judgment on the basis of qualified immunity in a § 1983 action involving excessive deadly force. After concluding that the victim’s right to be free from excessive force was a clearly established right, like the Fourth Amendment right to be free from unreasonable seizures, we held that summary judgment on the basis of qualified immunity was improper because, viewing the facts in the light most favorable to the non-moving party, “genuine issues of material fact precluded] a judicial determination of whether [the officer’s] conduct was objectively reasonable.” Id. at 275. A qualified immunity defense will not succeed in inducing a court to grant summary judgment when “the facts ..., considered collectively, present an incomplete picture of the [relevant] circumstances.” Salmon, 948 F.2d at 1137.
We have held that summary judgment motions may not be granted on any excessive force claims under § 1983 for which any genuine issue of material fact remains — regardless of whether the potential grant would arise from qualified immunity or from a showing that the officer merely had not committed a constitutional violation. Muskogee, 119 F.3d at 839. In Muskogee, police officers killed a man when he refused to drop his gun while threatening to commit suicide. Although eyewitness accounts differed dramatically as to the officers’ actions prior to their shooting, the district court nonetheless granted summary judgment on the ground that the officers had not committed a con *1315 stitutional violation. In reversing, we held that such material factual disputes involving the “immediate connection]” of an officer’s use of force in response to “a suspect’s threat of force” prevent a court from granting summary judgment. Id. at 840. Where a disputed issue of material fact remains, that ends the matter for summary judgment. The court may not move on to determine whether an officer’s actions were “objectively reasonable.”
On the issue of excessive force, neither party’s asserted material facts jibe with those of the other. Officer King says that Appellant behaved belligerently before he attempted to handcuff him. Appellant and his children say that Appellant did nothing but cooperate passively. Officer King contends that Appellant tried to resist the arrest by “turning] in to me, which just made me hold on to the control hold.” App. at 216. Appellant maintains that he complied physically at all times. App. at 215. Appellant says that Officer King pushed Appellant at least 10 feet into a store window to effectuate the arrest. Officer King tells a far more subdued tale of “maneuver[ing] [Appellant] against a storefront window [to] gain[ ] the necessary leverage to handcuff him.” Supp. App. at 2. Officer King mentions nothing about manhandling Appellant during the arrest process. Appellant asserts that Officer King “cocked [his arm] at an angle, ... clear up the middle of [his] back.” App. at 172-173. Although the district court erred in granting summary judgment via qualified immunity, the overwhelming number of factual divergences scream the obvious — that material disputed facts obviously remain as to the excessive force claim. The court erred in granting summary judgment on the excessive force issue.
IV.
A plaintiff states a cognizable Eighth Amendment claim for denial of medical attention if he “allege[s] acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.” Estelle v. Gamble, 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The right to custodial medical care is clearly established. Id. at 104, 97 S.Ct. 285. Although “[p]retrial detainees are protected under the Due Process Clause rather' than the Eighth Amendment, ... this Court applies an analysis identical to that applied in Eighth Amendment cases brought pursuant to § 1983.” Lopez v. LeMaster, 172 F.3d 756, 759 n. 2 (10th Cir.1999). “Deliberate indifference” involves both an objective and a subjective component. Sealock v. Colo., 218 F.3d 1205, 1209 (10th Cir.2000). The former is met if the deprivation is “sufficiently serious” — that is, “if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor’s attention.” Hunt v. Uphoff, 199 F.3d 1220, 1224 (10th Cir.1999). The latter is satisfied if an officer “knows of and disregards an excessive risk to [a detainee’s] health or safety.” Sealock, 218 F.3d at 1209 (quoting Farmer v. Brennan, 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). Essentially, the officer must be “aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.” Garrett v. Stratman, 254 F.3d 946, 949-950 (10th Cir.2001) (quoting Farmer, 511 U.S. at 837, 114 S.Ct. 1970.).
Where disputed material facts implicate either of the two questions of whether a serious medical need existed or whether an officer was deliberately indifferent to it, a court may not grant sum *1316 mary judgment. LeMaster, 172 F.3d at 764. In LeMaster, we reversed a district court’s grant of summary judgment on an inmate’s Eighth Amendment claim in a case in which “material issues of fact re-mainfed] concerning [1) ] how badly appellant was hurt”; 2) whether a sheriff was “aware of facts from which an inference could be drawn that a substantial risk of medical harm existed!,]” and 3) whether he drew that inference. Id. Similarly, in DeSpain v. Uphoff, 264 F.3d 965 (10th Cir.1999), we reversed a district court’s grant of summary judgment where “[n]early every material fact relating to [whether the impact of a prison flooding incident constituted a ‘sufficiently serious’ medical need such that it , would warrant attention and whether prison officials were deliberately indifferent to it] was hotly contested.” Id. at 972.
Accordingly, we must only inquire whether a genuine issue of material fact existed as to either the objective or subjective inquiry that would nullify a motion for summary judgment.
A.
As to the objective inquiry of whether Appellant’s OCD-induced panic attack during the ride to jail was “sufficiently serious,” Appellees downplay OCD by comparing it in gravity and prevalence to mere “sexual addiction” — held by the Court in Riddle v. Mondragon not to rise to the level of “sufficiently serious.” 83 F.3d 1197, 1204 (10th Cir.1996); Appellee Officer King’s Brief at 33.
Appellant had been diagnosed with and treated for OCD over a period of at least 15 years before the December 1997 incident. App. at 165-166, 183, 292. Moreover, OCD does not reside in the minds of a handful of unlucky sufferers; Appellant’s very real, diagnosed affliction greatly outweighs the “[v]ague allegations of eroded self-esteem, apathy, fear and feelings of differentness” that did not satisfy Estelle’s objective prong in Riddle. 83 F.3d at 1204.
According to the National Institute of Mental Health, OCD impacts more than two percent of the population — outpacing both schizophrenia and bipolar disorder in terms of frequency of affliction. National Institute of Mental Health, Obsessive-Compulsive Disorder, at http://www.nimh.nih.gov/pubhcat/ocd.cfm (last visited Oct. 9, 2002). See also 3 Ameri-CAN PSYCHIATRIC ASSOCIATION, TREATMENTS OF Psychiatric Disorders 2097 (1989) (reporting that, as early as 1984, “[t]he lifetime prevalence of OCD in the general population [was] more than two percent”). Seeping into mainstream consciousness, the disorder profoundly affected a successful writer in the 1997 Academy Award nominated film As Good As It Gets, and the popular cable television show Monk revolves around a detective who suffers from OCD. As Good As It Gets (Gracie Films 1997); Monk (USA Network, Inc.2002). Although our task is not to determine whether Appellant’s OCD is “sufficiently serious,” it is hardly inconceivable that a jury could find precisely that. Accordingly, the objective portion teeters on a disputed material fact that makes it wholly improper for the district court to have granted summary judgment.
B.
Assuming, arguendo, that OCD indeed qualifies as “sufficiently serious,” the subjective second prong also teems with disputed material facts that render summary judgment inappropriate at this stage. With regard to whether Officer King “kn[ew] of and disregarded] an excessive risk to [Appellant’s] health or safety,” Sealock, 218 F.3d at 1209 (quoting Farm *1317 er, 511 U.S. at 837, 114 S.Ct. 1970), neither party agrees on the material fact of whether Officer King even knew of Appellant’s condition — much less on whether he was “aware of facts from which the inference could be drawn that a substantial risk of serious harm existfed, or on whether he] dr[e]w the inference.” Garrett, 254 F.3d at 949-950 (quoting Farmer, 511 U.S. at 837, 114 S.Ct. 1970). Appellant claims that he incurred a OCD-related panic attack on the ride to the jail and that he twice told Officer King about the attack, only to receive no response. App. at 176. Officer King could not recall whether Appellant mentioned anything about a panic attack, though he did “believe that [Appellant] stated something to the fact that he’d had [health] problems in the past.” App. at 218.
According to the fourth edition of The Diagnostic and Statistical Manual of Mental Disorders-TV — a definitive source for the classification of mental illnesses — • the essential features of the disorder are “obsessions or compulsions cause marked distress, are time consuming ..., or significantly interfere with the person’s normal routine, occupational (or academic) functioning, or usual social activities or relationships.” American PsyohiatriC Association, The Diagnostic and Statistical Manual of Mental DisordeRS § 300.3 (4th ed.1994) [hereinafter DSM-IV]. Obsessions are “recurrent and persistent thoughts, impulses, or images that are experienced, at some time during the disturbance, as intrusive and inappropriate and that cause marked anxiety or distress.” Id. Compulsions are “repetitive behaviors (e.g., hand washing, ordering, checking) or mental acts (e.g., praying, counting, repeating words silently) that the person feels driven to perform in response to an obsession, or according to rules that must be applied rigidly.” Id.
When the OCD sufferer attempts to stave off a compulsion, “there is a sense of mounting tension....” American Psychiatric Association, The Diagnostic and Statistical Manual of Mental Disorders § 300.3 (3d rev. ed.1987). Moreover, anxiety is a common feature associated with the disorder. Id. Thus, OCD does not manifest itself as visibly as a bloody nose; rather, like a heart attack victim who remains on his feet, its characteristics are subtler and consequently more capable of being described by the sufferer than noticed by an outsider.
Although the simple act. of placing an innocent man — as was the case here — in a police car may unquestionably produce anxiety, Appellant’s allegation that he twice told Officer King that he was having a panic attack, coupled with Officer King’s admission that Appellant mentioned prior health problems, together signify that Officer King may have knoum of — and disregarded — an excessive risk to Appellant’s health. This is for a jury to decide. Just as our task is not to determine whether Appellant’s alleged OCD and panic attacks rose to the level of “sufficiently serious,” our task is not to decide whether Officer King was indeed ignorant to Appellant’s apparent pleas for assistance.
As in LeMaster, the point is that “material issues of fact remain concerning” whether Officer King was “aware of facts from which an inference could be drawn that a substantial risk of medical harm existed” and whether he drew that inference. LeMaster, 172 F.3d at 764. Strongly contradictory factual assertions as to the nature of OCD and as to Officer King’s response to Appellant’s pleas make summary judgment improper on Appellant’s Eighth Amendment claim.
Y.
We will not hold a municipality “liable [for constitutional violations] when *1318 there was no underlying constitutional violation by any of its officers.” Hinton v. City of Elwood, 997 F.2d 774, 782 (10th Cir.1993). When an officer deprives a citizen of a constitutional right, however, municipal governments may incur liability under § 1983 when “the action that is alleged to be unconstitutional implements or executes a policy, statement, ordinance, regulation or decision officially adopted and promulgated by that body’s officers.” Monell v. Dep’t of Social Services, 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Because vicarious liability will not open a municipality to liability simply when one of its officers has committed a constitutional violation, Monell, 436 U.S. at 694, 98 S.Ct. 2018, “[i]t is only when the ‘execution of the government’s policy or custom ... inflicts the injury’ that the municipality may be held liable under § 1983.” City of Canton v. Harris, 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989) (internal citation omitted). In the absence of an explicit policy or an entrenched custom, “the inadequacy of police training may serve as a basis of § 1983 liability ... where the failure to train amounts to a deliberate indifference to the rights of persons with whom the police come into contact.” Id.
Indeed, we have confirmed that this deliberate indifference standard may be satisfied “when the municipality has actual or constructive notice that its action or failure is substantially certain to result in a constitutional violation, and it consciously and deliberately chooses to disregard the risk of harm.” Barney v. Pulsipher, 143 F.3d 1299, 1307 (10th Cir.1999). Although a single incident generally will not give rise to liability, Okla. City v. Tuttle, 471 U.S. 808, 823, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985), “deliberate indifference may be found absent a pattern of unconstitutional behavior if a violation of federal rights is a ‘highly predictable’ or ‘plainly obvious’ consequence of a municipality’s action.” Barney, 143 F.3d at 1307 (internal citations omitted). The official position must operate as the “moving force” behind the violation, and the plaintiff must demonstrate a “direct causal link” between the action and the right violation. Bd. of County Comm’rs v. Brown, 520 U.S. 397, 399, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997). That is, “[w]ould the injury have been avoided had the employee been trained under a program that was not deficient in the identified respect?” City of Canton, 489 U.S. at 391, 109 S.Ct. 1197. With regard to any attempted showing of “deliberate indifference” by a municipality, the existence of “material issues of material fact precluded] summary judgment.” Cruz v. City of Laramie, 239 F.3d 1183, 1191 (10th Cir.2001).
A.
Because Appellant has failed to allege facts showing that Layton City manifested deliberate indifference to the rights of OCD sufferers who are taken into custody, we will affirm the district court’s grant of summary judgment to Layton City. Although Appellant may indeed show that Officer King has committed the prerequisite underlying Eighth Amendment violation, Appellant has not taken the subsequent step of linking the possible violation to a municipality custom or policy. The teachings of Monell and its progeny proscribe the attachment of vicarious liability to a municipality merely because the municipality employed the individual who committed a constitutional violation. It is absolutely necessary to show that “the ‘execution of the government’s policy or custom ... inflict[ed] the injury’ [in order to hold a] municipality ... liable under § 1983.” City of Canton, 489 U.S. at 385, 109 S.Ct. 1197 (internal citation omitted). With regard to Layton City, Appellant has *1319 alleged nothing more than that Officer King committed a constitutional violation. Appellant has not adequately tied the violation to a broader municipality custom— that is, deliberate indifference to OCD in the Layton City police department’s mental health training scheme. We may not infer from Appellant’s otherwise respectable assertion of the frequency of OCD that the municipality “ha[d] actual or constructive notice that its action or failure [was] substantially certain to result in a constitutional violation, and [they] consciously and deliberately [chose] to disregard the risk of harm.” Barney, 143 F.3d at 1307. Because Appellant has not alleged facts bridging the individual violation to a broader municipal custom, no genuine issue of material fact sits in dispute because none has been raised on this claim. Accordingly, we affirm the district court’s decision to grant summary judgment to Layton City.
B.
Davis County, however, is quite a different story. We reverse the district court’s grant of summary judgment to Davis County because Appellant has alleged the necessary facts that may establish that Davis County manifested deliberate indifference by failing to train its jail’s prebooking officers to recognize OCD and handle sufferers appropriately. “[T]he inadequacy of police training [with respect to OCD] may serve as a basis of § 1983 liability ... where the failure to train amounts to a deliberate indifference to the rights of persons with whom the police come into contact.” City of Canton, 489 U.S. at 385, 109 S.Ct. 1197. If “the [Davis County] ha[d] actual or constructive notice that its action or failure [was] substantially certain to result in a constitutional violation, and it consciously and deliberately eh[ose] to disregard the risk of harm,” Barney, 143 F.3d at 1307, Appellant could make out a showing of deliberate indifference — more than sufficient to quash a summary judgment motion.
Appellant has alleged facts showing that prebooking officers receive absolutely no training on OCD. They look only “for inmates that have a complete change of behavior ... odd behaviors, aggressive behaviors, suicidal indicators.” Id. If a prebooking officer is unsure how to address an inmate who complains of a panic attack, he or she must refer to a policy manual. App. at 279. The prebooking officers’ field of mental health knowledge is contained in the manual on booking procedures that indeed addresses mental health needs and delineates an initial screening process. App. at 362-364. The prebooking officers, however, are left with discretion in determining whether an inmate suffers from a psychological disorder requiring medical attention. Significantly, no discussion of OCD appears within it.
It hardly bears repeating, but OCD does not rival Halley’s Comet in its infrequency of appearance. OCD occurs in more than two percent of the population, causing “marked distress [and] significant interfer-encfence] with the person’s normal routine. ...” Supra Part IV (citations omitted). Although a jury shall decide exactly to what extent it has burst into the mainstream, one could hardly deem it an obscure disorder.
At the jail, Appellant reported his OCD for the standard medical screening sheet; it appeared as “CDC.” Besides the facts that Appellant also disclosed his panic attack syndrome, a prebooking officer “seems” to recall Appellant’s having asked for his medication because he was having a panic attack. App. at. 280. The prebook-ing officers, however, took away Appel *1320 lant’s medication, even after he informed them that he required it.
Given the frequency of the disorder, Davis County’s scant procedures on dealing with mental illness and the prebooking officers’ apparent ignorance to his requests for medication, a violation of federal rights is quite possibly a “ ‘plainly obvious’ consequence” of Davis County’s failure to train its prebooking officers to address the symptoms. Barney, 143 F.3d at 1307 (internal citations omitted). And this is for a jury to decide. That OCD is relatively common and that the county had procedures in place for dealing with inmates with psychiatric disorders suggest that the municipality may have had constructive notice of the illness’ prevalence and consequences. Accordingly, Appellant has raised a genuine issue of material fact as to whether the county had notice of and was deliberately indifferent in its failure to train prebooking officers on OCD.
C.
Moreover, the parties are at loggerheads over whether Appellant even suffered an injury directly resulting from the alleged deliberate indifference. Although Davis County contends that its prebooking officers’ actions in no way could have sparked an injury or the recurrence of OCD, Appellant argues that forcing him to remove his footwear without regard for his condition or need for medication triggered the onset of the disorder. Davis County asserts that prebooking officers noticed nothing so out of the ordinary as to warrant medical attention or a variance from routine policy. Appellant alleges that they cavalierly ignored his pleas and his condition. This conflict gives rise to another disputed issue of material fact. Deliberate indifference in this case is a question for the jury.
In sum, we conclude that disputed material facts exist as to whether Davis County expressed deliberate indifference to an OCD-sufferer’s rights via a failure to train and whether any deliberate indifference could operate as a causal link to his alleged injuries. We reverse the grant of summary judgment to Davis County.
* * * * *
For the foregoing reasons, we REVERSE the grant of summary judgment in favor of Officer King and Davis County. We AFFIRM summary judgment in favor of Layton City.