Reena EBERLE, Plaintiff,

v.

CITY OF NEWTON, Kansas; Richard Daily, as Chief of Police for The City of Newton and individually; and Brad McMichael, as a police officer for The City of Newton, and individually, Defendants.

No. 02–1348–JTM.

United States District Court, D. Kansas.

Oct. 30, 2003.

Frank J. Kamas, Terry D. Smith, Render Kamas, L.C., Wichita, KS, Richard C. Morgan, Morgan Law Offices, Newton, KS, for Plaintiff.

Chanda M. Feldkamp, J. Steven Pigg, Teresa L. Sittenauer, Fisher, Patterson, Sayler & Smith, Topeka, KS, Susan P. Selvidge, Fleeson, Gooing, Coulson & Kitch, L.L.C., Wichita, KS, for Defendants.

## MEMORANDUM AND ORDER

MARTEN, District Judge.

Plaintiff Reena Eberle has brought the present action under 42 U.S.C. § 1983 against defendants alleging she was subjected to excessive force while in the custody of the City of Newton, Kansas Police Department. The defendants in the case are the City of Newton, Newton Police Chief Richard Daily, and Brad McMichael, a former Newton Police Officer The defendants have filed motions for summary judgment, with one motion being filed on behalf of the City, Chief Daily, and McMichael in his official capacity, and a second motion filed on behalf of McMichael in his individual capacity.

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hospital,* 854 F.2d 365, 367 (10th Cir.1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.,* 754 F.2d 884, 885 (10th Cir.1985). The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.,* 812 F.2d 1319, 1323 (10th Cir. 1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the nonmoving party must come forward with specific facts showing the presence of a

genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.' " *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed. R.Civ.P. 56(e)) (emphasis in *Matsushita*). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

## 1. Findings of Fact

Shortly after 11:00 p.m., on March 16, 2001, Newton Police Officer Brad McMichael was dispatched to the Santa Fe Bar in Newton, Kansas to investigate a report that plaintiff Reena Eberle had stolen a purse. When he got to the bar, Jean Serrano, the theft victim, told him that Eberle had found out the police were coming and had just left. Serrano and a bar employee told McMichael that Eberle had left by herself, and was driving a gray car with a Kansas tag number 0XV437, and was driving drunk.

The bar is about one mile from Eberle's home. Eberle has testified that she had consumed half a can of beer at the bar. She left the bar because "my girlfriend said they'd called the police on me." She testified she drove herself home from the bar.

McMichael drove to the address where the vehicle tag number was registered, and saw Eberle entering the door. He saw Eberle's vehicle, with the tag number identified by Serrano, parked by her home. The hood was warm and the fan was running.

McMichael knocked on the door, and Eberle let him in. Eberle and McMichael knew each other from prior domestic violence calls to her home.

McMichael asked Eberle if she knew Jean Serrano and if she knew anything about a purse being stolen from the Santa Fe Bar. He also asked if Eberle had been to the bar. Initially, she denied she had been to the bar because she was on probation and not supposed to be at a bar or drinking alcoholic beverages. She also falsely told McMichael that someone else had driven her to and from the bar, although she eventually admitted that she had been there alone.

Eberle denied stealing the purse.

McMichael observed that Eberle appeared to be drunk, with a strong odor of alcoholic beverage on her breath, bloodshot and glazed eyes, and slurred speech. He asked Eberle if she would come outside to his patrol car and take a field breath alcohol test. Eberle agreed.

Eberle claims McMichael stopped the test before it was completed. McMichael has testified that the test is designed to measure alcohol content in the breath over a span of 45 seconds. As the subject blows into the unit, the numerical reading is designed to go up until the correct alcohol level is registered. McMichael stated that he stopped the test after approximately 10 seconds because within that short span of time, Eberle's alcohol level registered .08, the legal limit in Kansas.

Eberle does not claim that Officer McMichael touched her at her house.

Eberle was transported to the Harvey County Detention Center by back-up Officer Rousseau, and Eberle has no complaints about that trip.

Eberle was taken to the Intoxilyzer room (also called the Booking Room or Breathalyzer room). McMichael was already in the Intoxilyzer room and had started the videotape, when Officer Rousseau brought Eberle into the room in handcuffs. Rousseau removed Eberle's handcuffs. Eberle and Officer McMichael were seated at a table several feet apart. Rousseau remained in the room after removing the handcuffs, except for a brief period, before any use of force occurred.

The exit door of the Intoxilyzer room can be seen opening and closing on the videotape on the right in the videotape.

Eberle repeatedly accused Officer McMichael of lying about the first breath test. He gave Eberle the consent form for the Intoxilyzer test. Eberle agreed to take a breath test, but changed her mind later. McMichael began to read the consent form out loud, as required by law.

Eberle continued to call Officer McMichael a liar and other insults; he insulted her back. When McMichael had read through the consent form, he asked Eberle if she would take the Breathalyzer test. There was more argumentative discussion, then a period of silence.

McMichael had a discussion on the radio regarding the status of Eberle's driver's license. Rousseau left briefly through the exit door and returned while Eberle and McMichael were still seated at the table. After Rousseau returned, Eberle got up from her chair and refused to take the breath test. McMichael asked Eberle if her license was suspended, and she said no.

McMichael asked the radio operator to repeat that Eberle's license was suspended.

Eberle then said: "Let me out, would you let me out of here?" and moved toward the door. McMichael told Eberle twice to sit down, pointing at her chair, but she refused, saying "No."

Eberle headed past McMichael for the exit door. When she was passing McMichael, he took hold of her by the arm and pulled her away from the exit door, and swung her back toward her chair.

Eberle stumbled against the edge of the table and against a plastic chair, which slid on the slick tile floor, and she fell to the floor on her back. Officer McMichael was standing near Eberle, making no move toward her, and she kicked him in the shin.

McMichael had been trained to respond to defend himself from further injury by kicking a nerve which runs on the outside of the leg. McMichael responded with a kick to the side of Eberle's leg.

McMichael and Rousseau took immediate action to restrain Eberle, rolling her over and handcuffing her behind her back. McMichael's actions taken to restrain and handcuff Eberle after she kicked him were in accordance with his training.

Eberle claims that she suffered neck and shoulder injuries from being restrained during handcuffing, but she did not seek treatment right away, and no doctor has told her that any neck or shoulder problem is related to her arrest on March 16, 2001.

Eberle testified that she suffered bruises as a result of the incident. She did not seek medical treatment for the bruises. Eberle claims she began to experience a stiff neck, shoulder pain, and headache within days after her arrest. She testified that she had these symptoms before she met with Newton City Attorney Robert Myers and signed a document on April 12, 2001, which released the City of Newton,

together with its officers, agents and employees, from any liability arising from her arrest on March 16. She did not seek medical treatment for the injuries to her neck and shoulder right away. She acknowledges that no doctor has told her that any ongoing problem with her neck and shoulder is related to her arrest on March 16, 2001. Eberle has testified that as result of having McMichael place his knee on her neck, behind her ear, Eberle now suffers from pain in her face and pain that runs down her arm. She testified that part of her right hand also tingles and becomes numb. After leaving Newton and moving to Missouri, Eberle has been undergoing conservative treatment for the alleged injuries. This treatment consists of cervical traction which she is forced to perform twice a day at her home.

Eberle was told by her daughter there was a boot print on her lower back, and complains that McMichael kicked her; but she cannot remember if he kicked her, or where, and admits she has no injury from being kicked. No officer kicked Eberle in the lower back in the videotape.

Other officers entered the room when they heard Eberle screaming and helped Rousseau seat her in a chair. Eberle told McMichael she would press charges against him and he would hear from her lawyer.

McMichael told the other officers to take her away, and she says they took her to a booking area. Eberle has no complaint about that part of the booking and did not sue any other officers.

McMichael believes he used reasonable force to stop Eberle when she tried to get out of the Intoxilyzer room. He believes he used reasonable force to restrain Eberle after she kicked him. Chief Daily believes McMichael used reasonable force both to stop Eberle when she tried to get out of the Intoxilyzer room and to restrain Eberle after she kicked him. McMichael

secured the booking room videotape in a secure evidence locker after writing up the incident before he went home.

Eberle was five feet, four inches tall and weighed between 170 and 175 pounds. McMichael was six feet, one inch tall and weighed approximately 216 pounds.

McMichael's supervisor, Lieutenant Graves, believes that, with another officer in the room, McMichael could have subdued Eberle without the return kick. He believes the return kick was unnecessary but not abusive.

Eberle agrees that the videotape is an accurate and reliable record of what happened between her and McMichael in the Intoxilyzer room.

Eberle testified that at times she has consumed one and a half pints of vodka per day, plus beer. She admits she became loud and argumentative when she drank. She would drink until she passed out, and has described herself as the "walking dead" or "walking zombie." (Def. Exh. B, Eberle Dep. at 148).

On March 16, 2001, defendant McMichael charged Eberle with Driving Under the Influence of Alcohol, Driving With Suspended License, and Battery of a Law Enforcement Officer.

Eberle posted $300 on a $3,000 recognizance bond.

On April 10, 2001, the Newton City Prosecutor David Yoder dismissed all charges against Eberle. Yoder felt he did not have sufficient evidence to take the case to a jury. He believed Serrano had some credibility problems, and was concerned that McMichael did not actually witness Eberle driving her car. Having decided to dismiss the drunken driving and driving under suspension charges, Yoder chose not to prosecute the battery of a law enforcement officer because he felt it was not clear if she made contact with McMi-

chael, and felt that McMichael had reacted "rather harshly" to Eberle's kick. Yoder did not consult with McMichael regarding dropping the charges.

According to McMichael, Eberle made sufficient contact with his shin to leave a scab and scar.

Yoder never discussed the possibility of a release with Eberle. When Eberle was told by Police Chief Daily that the charges had been dropped, she asked if she could get her $300 bond money back, and he referred her to City Attorney Bob Myers.

Eberle met with City Attorney Robert Myers on April 12, 2001. Myers was not city prosecutor at the time and is not currently the city prosecutor.

Myers had no input or involvement in the decision to drop the charges against Eberle. Yoder had no input as to the written release. Myers gave Eberle a check for $300 to reimburse her for the bond costs. She cashed it the same day.

Eberle read the release before she signed it. Myers told her that signing the agreement would release all of her claims arising out of the arrest. She did not ask Myers any questions about the release. Myers was cordial and polite. He did not promise Eberle anything besides the $300 in exchange for her signature on the release. Eberle did not ask for additional time to consider the terms of the release, nor did she request legal counsel prior to signing it. Eberle testified that she was not pressured to sign the release.

Myers testified that he told Eberle it is not the City's practice to reimburse the cost of bond simply because an arrest does not result in the pursuit of any charges. Myers said he explained the release to her as follows: "I told her that she needed to understand that if she were to sign this release that day and then later consult with an attorney—I recall using the expression, if an attorney tells her she could

sue the City for a million dollars over what happened regarding her arrest that this release would prevent that from happening and she's giving up any right to do that." (Myers dep. at 14–15).

Eberle asserts in her response to the summary judgment motions that she thought in order to have the charges dropped, she was required to sign the release. Not only is this contrary to the testimony of all of the other witnesses, it contradicts her own admissions. For example, she explicitly admits (Def. McMicheal Uncontr. Fact ¶ 65) that she was referred to Myers to get her $300 back by Chief Daily *after Eberle was told by Daily that the charges had been dropped.*

Eberle knew when she signed the release that she would be giving up any claims she had stemming from her arrest. Eberle testified:

Q. And you did tell us that before you signed the release Bob Myers had explained to you that you'd be giving up any claims that you would have?

A. I believe he might have.

Q. And you knew that when you signed the release?

A. I believe so, I guess.

(Eberle dep. at 143)

The "WAIVER AND RELEASE OF CLAIMS" signed by Eberle provides:

FOR VALUABLE CONSIDERATION RECEIVED, the undersigned Reena Eberle, does hereby waive and release any and all claims of any nature whatsoever which the undersigned may now or in the future have against the City of Newton, Kansas, or any of its officers, agents or employees, in any manner relating to the recent arrest of the undersigned on charges of driving while intoxicated, driving with a suspended license and battery of a law enforcement officer. The undersigned acknowledges that the

payment and receipt of that consideration is not an admission of liability or wrongdoing on behalf of the City of Newton, Kansas, or any of its officers, agents or employees.

(Def. Exh. G). Myers gave Eberle a check for $300.00 from the City in exchange for the release.

The Newton Police Department has in place Policy 244.00 entitled "Lawful Arrest." The policy states in part: "The officer is justified in the use of any force which the officer reasonably believes to be necessary to defend the officer or another from bodily harm while making the arrest." (Policy 244.00)

The Newton Police Department has in place a Standard Operating Procedure ("SOP") 100–03 on the use of force. SOP 100–03 goes into detail about factors which must be considered by the officer in deciding whether to use force and how much force is needed. (SOP 100–03, 1–4). SOP 100–03 provides:

The level of force or control used by a police officer should always be the appropriate amount of force reasonably necessary to accomplish the legal duty of the officer. Physical force should not be used except when lesser levels of force have proven ineffective or when lesser levels would clearly be ineffective under the particular facts or circumstances of the incident.

(SOP 100–03, 2).

As a result of his actions taken against Eberle and two other individuals, McMichael was charged with three counts of battery or in the alternative mistreatment of a confined person. As a result of one of these incidents, a civil action was brought against the City of Newton. After review of the evidence, Yoder submitted a motion to amend two of the misdemeanor battery charges to felony aggravated battery. McMichael pleaded no contest to two misdemeanor battery charges, one of which was a result of his actions against Eberle. The remaining charges were dropped as a result of the plea bargain. Yoder has stated he believed he possessed sufficient evidence to present the cases against McMichael to a jury.

Due to his actions against Eberle, McMichael received a warning about his mannerisms. (Deposition of Newton Police Chief Daily.) Prior to his termination, the discipline McMichael received was for the manner in which he spoke to Eberle.

McMichael was employed as a Police Officer for the City of Newton from July 23, 1993 through November 21, 2001, when he was terminated. McMichael received 320 hours of basic training at the Kansas Law Enforcement Training Center ("KLETC") in 1995. The curriculum includes the proper use of force. There was training on the constitutional aspects of use of force, and the class was taught by a lawyer.

Law enforcement officers are required to complete 40 hours of police-related training each year in order to maintain certification. McMichael completed this training. He took defensive tactics training once every six months while employed by the City, which included instruction on the limits of the use of force.

Richard Daily is the Chief of Police of the City of Newton and has served in that position since January 2001. (Daily, 4, 6.)

Eberle filed the instant case on October 2, 2002; and her only claim remaining against McMichael individually in the Pretrial Order is a § 1983 claim for excessive force.

2. **Conclusions of Law**

The court will deny the defendants' argument that McMichael is entitled to qualified immunity. There is evidence in the present case from which a reasonable

fact-finder could conclude that McMichael violated a constitutional or statutory right, and that that right was clearly established when the alleged violation occurred. *Farmer v. Perrill,* 288 F.3d 1254, 1259 (10th Cir.2002). Taking all of the evidence in the light most favorable to Eberle, evidence exists from which a fact-finder could conclude that McMichael's conduct violated a constitutional right. Further, the fact-finder could conclude that the right in question was clearly established.

 The doctrine of qualified immunity protects police officers performing arrests, unless the officers violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Recently, the Tenth Circuit reiterated in *Oliver v. Woods,* 209 F.3d 1179 (10th Cir.2000), "[q]ualified immunity is designed to shield public officials from liability and ensure that erroneous suits do not even go to trial." *Id.* at 1185.

 "Not all force used by police rises to a constitutional violation." *Hewitt v. City of Truth or Consequences,* 758 F.2d 1375, 1379 (10th Cir.), *cert. denied,* 474 U.S. 844, 106 S.Ct. 131, 88 L.Ed.2d 108 (1985). Further, "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Graham v. Connor,* 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) (internal citations and quotation marks omitted). A police officer violates an arrestee's clearly established Fourth Amendment right to be free of excessive force during an arrest if the officer's arresting actions were not objectively reasonable in light of the facts and circumstances confronting him. *Olsen v. Layton Hills Mall,* 312 F.3d 1304 (10th Cir.2002). Reasonableness is assessed from the perspective of a reasonable officer on the scene, and recognizing that in

difficult circumstances an officer may need to make split second decisions. *Medina v. Cram,* 252 F.3d 1124, 1131 (10th Cir.2001). Relevant to the issue of reasonableness are the degree of force actually used, *Tennessee v. Garner,* 471 U.S. 1, 8–9, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985), and the extent of the injuries, if any, inflicted on the plaintiff. *Britschge v. Harmison,* 947 F.Supp. 435, 440 (D.Kan.1996). *See also Olsen,* 312 F.3d at 1314 (factors to be considered include the severity of the crime, the suspect's potential threat to the safety of officers and others, and whether the suspect attempted to resist or evade arrest).

The defendants here suggest that no constitutional deprivation occurred because McMichael was presented with a drunken detainee who attempted to escape from custody and who initiated the physical violence by kicking McMichael. While an ultimate finder of fact may ultimately take such a view of the case, the court here is compelled to view all of the evidence in the light most favorable to the plaintiff. Here, the core of the case is contained in a few seconds of videotape. The court concludes that, viewing the videotape and the rest of the evidence in the light most favorable to the plaintiff, a reasonable fact-finder could conclude that McMichael used excessive force against Eberle.

Observation of the videotape leads to several conclusions. First, it does not appear that Eberle is actually trying to escape custody. She simply walks toward the door and asks to leave the interrogation room. McMichael does not, as the defendants suggest, simply grab her arm and steer her back towards her chair. He throws her in the direction of the chair. Her fall is not the product of a slippery floor, but McMichael's forceful shove in the direction of the chair. McMichael initiated the violence. Eberle kicks, rather weakly,

at McMichael. McMichael's return kick is not, as the defense suggests, defensive in nature. At the time McMichael kicked Eberle, she was lying on the floor and presented no threat to him. His kick appears to be far harder than hers had been. The kick appears vindictive and punitive. It is Eberle's kick at McMichael, while she is lying on the floor having been thrown there by McMichael, that appears defensive in nature.

Further, it must be borne in mind that Eberle presented no danger to the officers. She was in an interrogation with two officers. It is uncontroverted that McMichael outweighs Eberle by nearly 50 pounds, and the videotape suggests that the second officer is also substantially built. Further, this incident happened in a police station; the officers in the room could have requested assistance from additional officers outside the interrogation room.

It is true that Eberle has not been shown to have substantial injuries which have been the subject of documented medical treatment. But this is counterbalanced by the wholly unnecessary nature of the violence used against her. The violence was unreasonably excessive in light of all of the circumstances.

■ The court further finds that the excessive force violated the clearly established constitutional rights of the plaintiff. The Tenth Circuit has observed:

> This reasonableness standard—which is "clearly established" for the purposes of § 1983 actions, *Wilson v. Meeks*, 52 F.3d 1547, 1552 (10th Cir.1995)—implores the court to consider factors including the alleged crime's severity, the degree of potential threat that the suspect poses to an officer's safety and to others' safety, and the suspect's efforts to resist or evade arrest. *Medina [v. Cram*, 252 F.3d 1124,] 1131 [(10th Cir.2001)]. Because the reasonableness inquiry overlaps with the qualified immunity analy-

sis, "a qualified immunity defense [is] of less value when raised in defense of an excessive force claim." *Id.* (*citing Quezada v. County of Bernalillo*, 944 F.2d 710, 718 (10th Cir.1991)). Whether an officer acted reasonably in using deadly force is "heavily fact dependent." *Romero v. Board of County Comm'rs*, 60 F.3d 702, 705 n. 5 (10th Cir.1995) (*quoting Wilson*, 52 F.3d at 1553).

*Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1314 (10th Cir.2002). This court finds that the level of force used by McMichael was unreasonable under the totality of the circumstances, that the right to be free from such force was clearly established, and that qualified immunity is inapplicable in the present action.

■ The court will grant summary judgment in favor of defendants based on the Release Agreement signed by Eberle. In exchange for the return of her $300 bond fee, Eberle signed a document which waived and released "any and all claims of any nature whatsoever" which Eberle "may now or in the future have against the City of Newton, Kansas, or any of its officers, agents or employees" relating to Eberle's arrest. As a result, all of Eberle's claims have been waived, and the parties released from liability.

■ A civil rights claim may be waived, so long as the waiver is knowing and voluntary under the totality of the circumstances. *Wright v. Southwestern Bell Telephone Co.*, 925 F.2d 1288, 1292 (10th Cir.1991). Here, the totality of circumstances support a finding that Eberle's waiver of rights was knowing and voluntary.

The release language was clear and specific. Although her education is limited, the uncontroverted facts establish that Eberle could and did understand the release before she signed it, and she knew what her rights were upon signing. Here,

the language of the written waiver and release is clear. Additionally, at the time of the release, the criminal charges against Eberle had been dropped, and she was aware of this. Thus, contrary to the arguments of the plaintiff, this is not an example of a disfavored "release-dismissal" agreement. Accordingly, the court finds that the agreement should be enforced.

 Even if the release in question was such a release-dismissal agreement, it should nonetheless be enforced under the facts of the case. Such agreements are still enforceable if they are voluntary, there is no evidence of prosecutorial misconduct, and enforcement of the agreement would not adversely affect the public interest. *Town of Newton v. Rumery,* 480 U.S. 386, 398, 107 S.Ct. 1187, 94 L.Ed.2d 405 (1987).

The plaintiff relies on cases such as *Livingstone v. North Belle Vernon Borough,* 91 F.3d 515 (3rd Cir.1996), and *Friebis v. Kifer,* 47 Fed.Appx. 699 (6th Cir.2002). The court finds these cases highly distinguishable in terms of the level of force and harm inflicted on the plaintiff. Unlike *Livingstone,* the release here was not an oral release imposed on plaintiff during extremely difficult psychological circumstances. In *Friebis,* the release was written but was clearly a release-dismissal agreement. All of the evidence establishes that the agreement here was freely and voluntarily entered into. Prior to the release, Yoder had dismissed the charges on the basis of a lack of evidence; there is absolutely no evidence that this conclusion was prompted by anything other than Yoder's professional judgment that a conviction was doubtful. None of the serious public policy concerns presented in the cited cases are implicated here.

 In addition, the court holds that the claim against McMichael in his official capacity must be dismissed. That is, even if the written release did not bar all of Eberle's claims, all claims against McMichael in his official capacity should be dismissed. McMichael is no longer a City employee and has not been a City employee since prior to the filing of the instant suit. Thus, he has no official capacity and the claims against him in his official capacity fail.

 Further, even if McMichael still worked for the City, the official capacity claim against him is redundant of the claims against the City. An action against a person in his official capacity is, in essence, an action against the government entity for whom the person works. *Kentucky v. Graham,* 473 U.S. 159, 165–66, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985). "As long as the government entity receives notice and an opportunity to respond, an official capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Id.* at 166, 105 S.Ct. 3099.

Thus, Eberle's claim against McMichael in his official capacity, if he were still employed by the City, is redundant of the same claim against the City and it therefore fails. *See, e.g., Burns v. Board of County Commissioners of Jackson County, Kansas,* 197 F.Supp.2d 1278, 1296–97 (D.Kan.2002); *Sims v. Unified Government of Wyandotte County/Kansas City, Kansas,* 120 F.Supp.2d 938, 944 (D.Kan. 2000).

Next, in the same vein, the court finds that the claim against Chief Daily in his official capacity is redundant of the claim against the City and must be dismissed. Even if the written release did not bar all of Eberle's claims, the official capacity claim against Chief Daily, an employee of the City, is clearly redundant of Eberle's claim against the City and must be dismissed.

 The court next finds that the City cannot be held liable because there is

no custom, policy or practice which caused the alleged violation of Eberle's rights. A municipality is not liable under § 1983 simply because it employs a constitutional tortfeasor. *Monell v. New York City Department of Social Services*, 436 U.S. 658, 692, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). To impose liability upon a municipality under § 1983, a constitutional tort must have been committed by an ultimate policy-making official of the municipality, typically the governing body of the municipality; by an employee acting pursuant to a policy or custom of the municipality; or by an employee as a result of deliberate indifference of the municipal governing body to training of the employee. *Board of County Commissioners of Bryan County, Oklahoma v. Brown*, 520 U.S. 397, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997).

Here, there is no basis in the evidentiary record to conclude that McMichael was a City policy-maker. Nor is there any evidence that McMichael acted pursuant to an unconstitutional policy or practice of the City. Although Eberle points to other complaints involving McMichael, she does not show any substantiated citizen complaint or litigation lodged before the events here at issue.

The Newton Police Department has a policy and a standard operating procedure which provides for the appropriate use of force. The admissible evidence before the court fails to show that the City had any alternative de facto policy of tolerating the excessive use of force.

Nor is there evidence showing a failure to train McMichael, or that such alleged failure amounted to deliberate indifference on the part of the City. A failure to train is a violation of § 1983 only when the city's "failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." *City of Canton v. Harris*, 489 U.S. 378, 389, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). Here, Eberle has failed to show any inadequate training which demonstrates a deliberate indifference on the part of the City toward persons with whom the police officers come into contact. *See Allen v. City of Muskogee*, 119 F.3d 837, 841–842 (10th Cir.1997). Eberle has not shown any obvious need for more training, such that the absence of that training can be said to reflect deliberate indifference on the part of the City. *Jenkins v. Wood*, 81 F.3d 988, 994 (10th Cir.1996).

Here, the evidence established that McMichael received basic training. This training included training on the use of force, and on the constitutional aspects of that use. The class was taught by a lawyer. In addition, McMichael received 40 hours of continuing education each year in order to maintain his certification. He took defensive tactics training every six months while employed by the City, which included instruction on the use of force. The court finds that McMichael was provided adequate training, specifically on the use of force. Eberle has not shown a failure to train. She has not shown deliberate indifference on the part of the City.

Next, the court finds that summary judgment is appropriate as to the claims against Chief Daily in his individual capacity pursuant. There is no evidence that Chief Daily participated in McMichael's actions, or acquiesced in them. Daily was not McMichael's direct supervisor, and therefore he cannot be held liable on a theory of failure to supervise. *See Arceo v. City of Junction City, Kansas*, 182 F.Supp.2d 1062, 1092 (D.Kan.2002). Eberle's suggestion that Daily is personally liable because of a failure to train McMichael fails for reasons noted earlier. The evidence here fails to demonstrate inade-

quate training which reflects deliberate indifference to the rights of persons with whom police officers come into contact.

■ Further, Chief Daily is entitled to qualified immunity. Eberle has not shown that Chief Daily has committed a constitutional violation on his own, or that he is responsible for McMichael's use of force. Nor has she shown any clearly-established right requiring Daily to provide different training or supervision to McMichael in the three months Daily worked for the City prior to Eberle's arrest.

IT IS ACCORDINGLY ORDERED this 30th day of October 2003, that the defendants' Motions for Summary Judgment (Dkt. Nos. 60, 62) are hereby granted for the reasons stated herein.