FILED
United States Court of Appeals
Tenth Circuit

August 2, 2018

Elisabeth A. Shumaker
Clerk of Court

UNITED STATES COURT OF APPEALS

FOR THE TENTH CIRCUIT
_____

CLYDE ALLEN RIFE,

      Plaintiff - Appellee,

v.

JOE JEFFERSON,

      Defendant - Appellant,

and

OKLAHOMA DEPARTMENT OF
PUBLIC SAFETY; JOHNNY TADLOCK;
CHAD DALE; JONATHON WILLIS;
MCCURTAIN COUNTY JAIL TRUST;
SCOTT MCCLAIN,

      Defendants.

_____

CLYDE ALLEN RIFE,

      Plaintiff - Appellee,

v.

CHAD DALE; JONATHON WILLIS,

      Defendants - Appellants,

and

OKLAHOMA DEPARTMENT OF
PUBLIC SAFETY; JOE JEFFERSON,
State Trooper; MCCURTAIN COUNTY
JAIL TRUST,

No. 17-7037
(D.C. No. 6:14-CV-00333-GKF)
(E.D. Okla.)

No. 17-7038
(D.C. No. 6:14-CV-00333-GKF)
(E.D. Okla.)

Defendants.

_____

**ORDER AND JUDGMENT***
_____

Before **LUCERO**, **McKAY**, and **MORITZ**, Circuit Judges.
_____

To survive a motion for summary judgment on qualified-immunity grounds, a plaintiff must make a two-part showing. First, the plaintiff must demonstrate that under the relevant version of the facts, the defendant violated a constitutional right. Second, the plaintiff must demonstrate that the contours of that constitutional right were clearly established at the time of the alleged violation.

Here, the district court initially ruled that Joe Jefferson, Chad Dale, and Jonathon Willis (collectively, the defendants) were entitled to qualified immunity on plaintiff Clyde Rife's 42 U.S.C. § 1983 claims because Rife failed to satisfy the first part of this two-part test. Specifically, the district court ruled that Rife failed to demonstrate the defendants violated the Fourteenth Amendment by displaying deliberate indifference to Rife's serious medical needs. And in light of that conclusion, the district court granted the defendants' motions for summary judgment without addressing whether the law was clearly established.

Rife appealed, and a panel of this court reversed. It held that under the relevant version of the facts, Rife indeed demonstrated a constitutional violation. But like the

_____

* This order and judgment isn't binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. But it may be cited for its persuasive value. *See* Fed. R. App. P. 32.1; 10th Cir. R. 32.1.

district court before it, the panel declined to address whether the defendants' conduct violated clearly established law. Instead, the panel remanded that question to the district court. And this time, the district court ruled in Rife's favor. That is, it determined that the defendants violated clearly established law by displaying deliberate indifference to Rife's serious medical needs. Thus, the district court denied the defendants' motions for summary judgment. The defendants now appeal that ruling.

We affirm in part and reverse in part. To the extent the district court ruled that Jefferson's conduct violated clearly established law, we agree. Accordingly, we affirm the portion of the district court's order denying Jefferson's motion for summary judgment on qualified-immunity grounds. But we disagree with the district court's conclusion that Willis' and Dale's conduct violated clearly established law. So we reverse the portion of the district court's order denying their motion for summary judgment and remand with directions to enter summary judgment in their favor.

## Background

In an interlocutory appeal from an order denying qualified immunity at the summary-judgment stage, "[t]he district court's factual findings and reasonable assumptions" generally "comprise 'the universe of facts upon which we base our legal review.'" *Cox v. Glanz*, 800 F.3d 1231, 1242 (10th Cir. 2015) (quoting *Fogarty v. Gallegos*, 523 F.3d 1147, 1154 (10th Cir. 2008)). Thus, our first step is typically to determine just what those "factual findings and reasonable assumptions" are. *Id.* But

3

here, another panel of this court has already made those determinations in a previous appeal. *See generally Rife v. Okla. Dep't of Pub. Safety (Rife I)*, 854 F.3d 637 (10th Cir.), *cert. denied*, 138 S. Ct. 364 (2017). Accordingly, under the law-of-the-case doctrine, we derive the following historical facts from our decision in that appeal. *See Rohrbaugh v. Celotex Corp.*, 53 F.3d 1181, 1183 (10th Cir. 1995) ("[W]hen a case is appealed and remanded, the decision of the appellate court establishes the law of the case and ordinarily will be followed by both the trial court on remand and the appellate court in any subsequent appeal.").

On May 14, 2013, Jefferson, an Oklahoma state trooper, found Rife sitting on a motorcycle on the side of a road. *See Rife I*, 854 F.3d at 641. Rife told Jefferson that he was fine. But there were obvious signs to the contrary. For instance, Rife had dried blood on his nose. There were grass stains on his clothes. And there were grass and grass stains on his motorcycle, "indicating that he had been thrown from" the bike. *Id.* at 643. Rife also appeared to be confused: his speech was slurred and he couldn't provide the date, the time, or his social security number. Likewise, although Rife knew he'd been in Idabel, Oklahoma earlier that day, he couldn't remember what he'd done there. *Id.*

Jefferson suspected that Rife was intoxicated. But because intoxication and head injuries can manifest in similar ways, Jefferson performed further testing. Rife displayed no other signs of a head injury, such as "unequal tracking of the pupils, unequal pupil size, and resting nystagmus." *Id.* at 643–44. Yet he did exhibit six "clues" of intoxication. *Id.* at 644. Rife also failed or was unable to complete "four

4

additional tests" for intoxication that Jefferson attempted to perform. *Id.* Before one of those tests, Rife told Jefferson he felt "floaty." *Id.* at 644. During another, "Rife lost his balance." *Id.*

Nevertheless, Jefferson knew Rife wasn't drunk. Instead, he suspected that Rife "had taken too much pain medication." *Id.* at 644. On that basis, Jefferson arrested Rife for public intoxication. At the time of the arrest, Jefferson knew that Rife had—despite Rife's repeated protestations to the contrary—"obviously been in an accident." *Id.* But Jefferson didn't think the accident was a serious one. For one thing, Rife didn't "have the type of visible injuries that would likely result from a high-speed or high-impact accident." *Id.* For another, "there was little damage to the motorcycle or [its] saddlebags." *Id.* Thus, Jefferson transported Rife directly to jail. *Id.* at 645. Along the way, Rife said that his chest and heart hurt and "groaned in pain."[1] *Id.* at 648. At some point, Rife also "stated that he felt sick." *Id.* Nevertheless, Jefferson didn't seek medical attention for Rife. *Id.* at 649.

When Jefferson arrived at the jail with Rife in tow, he told jail officials Willis and Dale that Rife was under arrest for public intoxication. But neither Jefferson nor Rife "mentioned the motorcycle accident." *Id.* at 641, 651. Nor did they indicate that Rife "might have been injured." *Id.* at 651.

---

[1] Jefferson insists that "these statements were mumbled in a barely audible manner." Aplt. Br. 13. But we have already determined otherwise. *See Rife I*, 854 F.3d at 648 n.6 ("Rife did not whisper these statements; a factfinder could reasonably infer that the statements were loud enough for [Jefferson] to hear."); *Rohrbaugh*, 53 F.3d at 1183.

During the booking process, Rife "was dazed": he "slurr[ed] his words and show[ed] confusion about where he was [and] what he was doing." *Id.* As a result, Willis and Dale both suspected that Rife was "on" something. *Id.* But Willis wasn't sure what, and neither man could smell alcohol on Rife's breath. Nevertheless, Willis placed Rife on medical observation, "fearing that he might throw up in his sleep. This placement required jail personnel to check on [Rife] every [15] minutes."[2] *Id.*

After booking him into the jail, Willis and Dale moved Rife to a holding cell. As he entered the cell, "Rife moaned loudly, showed obvious pain, and repeatedly complained of stomach pain."[3] *Id.* Nevertheless, neither Willis nor Dale "obtain[ed] medical attention for" him. *Id.* at 652.

The next morning, Rife collapsed in the bail bondsman's office. *Id.* As it turns out, Rife wasn't intoxicated after all; instead his behavior was the result of a head injury that he suffered in the motorcycle accident. *Id.* at 641.

Rife later sued the defendants under § 1983, asserting that their failure to seek medical attention for him violated his rights under the Fourteenth Amendment. *See Rife I*, 854 F.3d at 642; *id.* at 647 ("[T]he Fourteenth Amendment is violated if state

---

[2] Rife asserts that he "was not checked on every fifteen minutes as required by policy." Aplee. Br. 26. But he doesn't suggest that any of the defendants were responsible for, or even aware of, this breach.

[3] Willis and Dale insist that Rife didn't complain, moan, or otherwise indicate he was in pain until "after [they] had already placed [him] in the holding cell," at which point they were no longer present. Rep. Br. 8. But again, we have already determined otherwise. *See Rife I*, 854 F.3d at 651 (noting that Rife's cellmate unambiguously stated Rife displayed these signs of pain "*when he entered* the holding cell" (emphasis added)); *id.* at 652 (concluding that Willis and Dale "were present at the time"); *Rohrbaugh*, 53 F.3d at 1183.

6

officials are deliberately indifferent to a pretrial detainee's serious medical needs."). The defendants moved for summary judgment and the district court granted their motions, concluding that Rife failed to demonstrate the defendants' conduct rose to the level of deliberate indifference. *Id.* at 642.

Rife appealed and this court reversed in part, holding that a reasonable jury "could find facts supporting [Rife's] deliberate indifference claims against" the defendants. *Id.* We then remanded to the district court to determine in the first instance whether the defendants' conduct violated clearly-established law. *Id.*

On remand, the district court ruled that the law was clearly established. Specifically, it concluded that Jefferson violated Rife's "clearly established right to medical attention following a motorcycle accident," and that Willis and Dale violated Rife's "clearly established right to medical attention when placed in a holding cell while 'obviously in pain.'" App. vol. 8, 1312–13 (quoting *Rife I*, 854 F.3d at 651). Thus, the district court denied the defendants' motions for summary judgment. The defendants appeal.

**Discussion**

Section 1983 provides a federal cause of action against any individual who, while acting under color of state law, deprives another individual of his or her federal rights. But the doctrine of "[q]ualified immunity 'protects governmental officials from liability for civil damages'" unless their conduct "violate[s] 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Weise v. Casper*, 593 F.3d 1163, 1166 (10th Cir. 2010) (quoting *Pearson v. Callahan*,

7

555 U.S. 223, 231 (2009)). Thus, when a defendant asserts qualified immunity as a defense to a § 1983 claim at the summary-judgment stage, the burden shifts to the plaintiff to make a two-part showing. First, the plaintiff must demonstrate that on the facts as alleged, the defendant violated a constitutional right. Second, the plaintiff must demonstrate that the contours of that right were clearly established at the time of the alleged violation. *Cox*, 800 F.3d at 1245. "If the plaintiff fails to satisfy either part of the two-part inquiry, the court must grant the defendant qualified immunity." *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001).

Here, Rife has already cleared the first of these two hurdles. That is, a panel of this court has already held that, based on the relevant "universe of facts," Jefferson, Willis, and Dale violated the Fourteenth Amendment by displaying deliberate indifference to Rife's serious medical needs. *Cox*, 800 F.3d at 1242 (quoting *Fogarty*, 523 F.3d at 1154); *see also Rife I*, 854 F.3d at 642. Thus, the lone question before us in this appeal is whether the law was clearly established at the time of that violation.[4] *See Rohrbaugh*, 53 F.3d at 1183 (explaining law-of-the-case doctrine).

---

[4] As a preliminary matter, Rife asserts that the defendants "waived" their clearly-established arguments by raising them "for the first time during a post-remand hearing." Aplee. Br. 12. The defendants disagree, maintaining that they consistently advanced these arguments below. We need not resolve the parties' disagreement on this point. Even assuming the defendants never expressly asserted below that the law wasn't clearly established, we would reach this issue on appeal for two reasons. First, Rife doesn't dispute that the defendants initially asserted qualified immunity as a defense, "[a]nd this defense *necessarily* included the clearly-established-law question." *Cox*, 800 F.3d at 1245. Second, the district court addressed the clearly-established-law question below, and "both parties had full opportunity to argue—and did argue—this issue on appeal." *Margheim v. Buljko*, 855

8

In determining whether the law was clearly established, we ask whether Rife has "identif[ied] an on-point Supreme Court or published Tenth Circuit decision; alternatively, 'the clearly established weight of authority from other courts must have found the law to be as [he] maintains.'" *Quinn v. Young*, 780 F.3d 998, 1005 (10th Cir. 2015) (quoting *Weise*, 593 F.3d at 1167). Of course, this isn't to say that Rife must direct us to a case that is "*exactly* on point." *Weise*, 593 F.3d at 1167 (emphasis added) (explaining that plaintiff can demonstrate law was clearly established even if "the very action in question" hasn't "previously been held unlawful" (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987))). "[B]ut existing precedent must have placed the . . . constitutional question beyond debate." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). And to do that, a previous decision must be "'particularized' to the facts of the case" before us. *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (quoting *Creighton*, 483 U.S. at 640) (warning courts not to define the clearly-established right "at a high level of generality" (quoting *al-Kidd*, 563 U.S. at 742)).

In other words, to demonstrate the law was clearly established, Rife must identify a case in which a defendant "acting under similar circumstances as" Jefferson, Willis, and Dale "was held to have violated" the Eighth or Fourteenth Amendments. *Id.*; *see also Martin v. Bd. of Cty. Comm'rs*, 909 F.2d 402, 406 (10th Cir. 1990) (explaining that the Fourteenth Amendment entitles pretrial detainees to

---

F.3d 1077, 1089 (10th Cir. 2017). Thus, we opt to resolve this purely legal question. *See id.* at 1087.

9

"the same degree of protection regarding medical attention afforded convicted inmates under the [E]ighth [A]mendment"). Thus, our task is to examine the cases that the district court relied on below and those that Rife cites on appeal and ask whether any of those cases satisfy this test. *See Apodaca v. Raemisch*, 864 F.3d 1071, 1076 n.3 (10th Cir. 2017) (explaining that plaintiff bears burden of identifying decision that clearly establishes relevant right and declining to consider "potential sources" of authority that plaintiffs didn't rely on), *petition for cert. filed* Mar. 13, 2018 (No. 17-1284); *Cox*, 800 F.3d at 1247 (noting that because plaintiff failed to "direct[] our attention" to decision that clearly established relevant right, we could hold—"[o]n this basis alone"—that plaintiff failed to "properly la[y] the groundwork to defeat [defendant's] assertion of qualified immunity").

In undertaking this inquiry, we first address whether Rife has identified a case that clearly establishes Jefferson's conduct violated the Fourteenth Amendment. We then turn to the question of whether he has identified such a case vis-à-vis Willis and Dale.

I. **Jefferson**

In ruling that Jefferson's conduct violated Rife's clearly established Fourteenth Amendment rights, the district court cited six cases: *Barton v. Taber*, 820 F.3d 958 (8th Cir. 2016); *Marquez v. Board of County Commissioners*, 543 F. App'x 803 (10th Cir. 2013) (unpublished); *Olsen v. Layton Hills Mall*, 312 F.3d 1304 (10th Cir. 2002); *Garcia v. Salt Lake County*, 768 F.2d 303 (10th Cir. 1985); *Marquez v. Board of County Commissioners*, No. 11-CV-838 JAP/WDS, 2012 WL 12895017

10

(D.N.M. Dec. 3, 2012), *aff'd* 543 F. App'x 803; and *Kraft v. Laney*, No. CIV S-04-0129 GGH, 2005 WL 2042310 (E.D. Cal. Aug. 24, 2005).

But as Jefferson points out, two of these six cases were decided after May 14, 2013—the date on which the events at issue here transpired. *See Barton*, 820 F.3d 958; *Marquez*, 543 F. App'x 803. Thus, these cases are "of no use in the clearly established inquiry." *Kisela v. Hughes*, 138 S. Ct. 1148, 1154 (2018) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 200 n.4 (2004)); *see also Haugen*, 543 U.S. at 200 n.4 (explaining that when judicial decisions "postdate the conduct in question," they are incapable of "giv[ing] fair notice" to government officials). Similarly, because two of the other cases the district court cited (*Marquez*, 2012 WL 12895017, and *Kraft*, 2005 WL 2042310) are district-court cases, they are likewise incapable of clearly establishing the law. *See Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011) ("[D]istrict court decisions—unlike those from the courts of appeals—do not necessarily settle constitutional standards . . . ."); *Estate of B.I.C. v. Gillen*, 761 F.3d 1099, 1106 (10th Cir. 2014) ("[W]e can disregard district-court decisions cited by the [plaintiff], which can be persuasive on the merits of a constitutional claim but cannot clearly establish what the law is.").

Of the cases the district court relied on, that leaves only *Olsen*, 312 F.3d 1304, and *Garcia*, 768 F.2d 303. And as Rife points out, some of the underlying facts in *Garcia* are indeed similar to the facts before us here. For instance, the decedent in *Garcia* was arrested for driving under the influence after he was involved in a traffic accident. 768 F.2d at 305. But when the decedent complained of back pain, he "was

11

transported by ambulance to a hospital." *Id.* Left unmonitored, he then "ingested an overdose of a . . . prescribed medication[]" and escaped from the exam room. *Id.* Officers later found him "passed out on the pavement." *Id.* Unaware that he had ingested any drugs, officials transferred the then semi-conscious decedent to the jail and placed him in a holding cell, where an officer checked on him every 30 minutes. The decedent was found unconscious at approximately 8:30 p.m. and "found apparently dead" approximately two hours after that. *Id.* at 305–06. An internist later testified that the decedent "would have survived the . . . overdose and could have been stabilized if he had been transported to the hospital when observed at 8:30 p.m. . . . and found to be unconscious." *Id.* at 306.

The decedents' widow and parents brought suit against the county, several of its officials, and various other individual defendants under § 1983. They alleged "that the decedent's death was caused by the execution of official policies, practices or customs of" the county that "were deliberately indifferent to the serious medical needs of" the jail's pretrial detainees and that "violated the decedent's constitutional right to receive reasonable and adequate medical care." *Id.* at 305. A jury agreed, finding that the county violated the decedent's constitutional rights. But importantly, the jury concluded that none of the individual defendants violated those rights. *See id.* at 309 n.6.

On appeal, the county characterized the jury's verdict as inconsistent, asserting that "a finding of unconstitutional conduct by" at least one of the individual defendants was "a prerequisite to a finding that the [c]ounty [was] liable." *Id.* at 306.

12

We rejected that argument, explaining that "the combined acts or omissions of several employees acting under a governmental policy or custom may violate an individual's constitutional rights," even if "the acts or omissions" of one single employee do not. *Id.* at 310. And we also found sufficient evidence to support the jury's finding that the county was deliberately indifferent to the decedent's serious medical needs, citing the county's "gross deficiencies . . . in staffing and procedures to monitor persons admitted to the jail in an unconscious condition who [were] suspected of being intoxicated." *Id.* at 308. Accordingly, we affirmed the judgment against the county. *Id.* at 310.

According to Rife, "there are obvious parallels between *Garcia* and the case at bar." Aplee. Br. 27. We don't necessarily disagree. But Rife overlooks a critical distinction between the two cases: *Garcia* involved a finding of *municipal* liability. That is, *Garcia* establishes that a municipality violates the Fourteenth Amendment when (1) it has a policy of admitting intoxicated, unconscious individuals into its jail; (2) it fails to adequately staff the jail in a manner that keeps those individuals safe from serious harm; and (3) injury results from its employees' "execution of [the municipality's] policy or custom." *Id.* at 307–08, 310. Here, though, Rife doesn't suggest that Jefferson was responsible for creating or implementing a policy that caused Rife's injuries. Nor does Rife suggest Jefferson had anything to do with staffing the jail or ensuring that he was adequately monitored once he was booked into the jail. Accordingly, *Garcia* isn't a case in which a defendant "acting under

13

similar circumstances as" Jefferson "was held to have violated" the Fourteenth Amendment. *Pauly*, 137 S. Ct. at 552.

To the extent that *Olsen*, 312 F.3d 1304, also involved a finding of municipal liability, we reach the same conclusion. There, the defendant-officer arrested the plaintiff—who suffered from obsessive-compulsive disorder (OCD)—and then transferred him to the county jail. *Id.* at 1309–10. "[E]n route to the jail," the plaintiff informed the arresting officer that he was having a panic attack. *Id.* at 310. But the arresting officer "neglected to address [the plaintiff's] two pleas for assistance." *Id.*

When the two men arrived at the jail, the plaintiff informed jail employees "that he had OCD and required medication to stave off panic attacks." *Id.* Nevertheless, "jail officers took [the plaintiff's] medication from him and insisted— per search procedure—that he remove his shoes and socks." *Id.* The plaintiff "recoiled at the request, refusing because of a fear of contamination from the dirty floor." *Id.* He later "acceded to the demand, but incurred another panic attack in the process" *Id.* "The prebooking officers also forced [the plaintiff] to be fingerprinted without heeding his concerns about cleanliness." *Id.*

As relevant here, the plaintiff sued the arresting officer and the county under § 1983, alleging deliberate indifference to his serious medical needs. *Id.* at 1308–09. The district court granted summary judgment to both defendants, and the plaintiff appealed. *Id.* at 1311. We reversed the district court's order granting summary judgment to the arresting officer on qualified-immunity grounds, concluding that on the facts alleged, a jury could find the officer violated the plaintiff's clearly

14

established rights by displaying deliberate indifference to the plaintiff's serious medical needs. *Id.* at 1315–17. Likewise, we reversed the district court's order granting summary judgment to the county, reasoning "that disputed material facts exist[ed] as to" (1) whether the county "expressed deliberate indifference to an OCD-sufferer's rights via a failure to train" its jail staff on how to recognize and respond to individuals suffering from OCD and (2) "whether any deliberate indifference could operate as a causal link to his alleged injuries." *Id.* at 1319–20.

To the extent we reversed the district court's award of summary judgment to the county in *Olsen*, we did so based on a theory of municipal liability: we held that a reasonable jury could find the county liable for its failure to train jail staff regarding how to recognize and respond to individuals suffering from OCD. *See* 312 F.3d at 1320. This aspect of *Olsen*'s holding—like the finding of municipal liability in *Garcia*, 768 F.2d 303—wouldn't have put Jefferson on notice that his individual conduct in failing to obtain medical care for Rife violated the Fourteenth Amendment. *See Pauly*, 137 S. Ct. at 552.

But we cannot say the same of *Olsen*'s discussion of the arresting officer. In evaluating whether he violated the plaintiff's constitutional rights, we recognized that the plaintiff's panic attack may not have "manifest[ed] itself . . . visibly." *Olsen*, 312 F.3d at 1317. Yet we reasoned that, much like the symptoms of a heart attack, the symptoms of a panic attack may be "subtler and consequently more capable of being described by the sufferer than noticed by an outsider." *Id.* And in light of the fact that the plaintiff in *Olsen* "described" his "subtler" symptoms to the arresting officer by

15

expressly informing him that he was experiencing a panic attack, we concluded that the officer's failure to obtain medical treatment for the plaintiff "ma[d]e summary judgment" on qualified-immunity grounds "improper." *Id.*

The same is true here. Rife may not have had "the type of visible injuries that would likely result from a high-speed or high-impact accident." *Rife I*, 854 F.3d at 644. Nevertheless, Jefferson admitted that he knew "Rife had been in a motorcycle accident." *Id*. And much like the plaintiff in *Olsen*, Rife repeatedly relayed to Jefferson the "subtler" symptoms of the injuries he suffered in that accident. *Olsen*, 312 F.3d at 1317. For instance, Rife (1) informed Jefferson "that he felt sick" and "floaty"; (2) repeatedly told Jefferson that his chest and heart hurt; and (3) "groaned in pain." *Rife I*, 854 F.3d at 644.

In fact, if anything, the case against Jefferson is stronger than was the plaintiff's case against the arresting officer in *Olsen*. Here, in addition to verbally informing Jefferson about those aspects of his condition that weren't necessarily subject to "notice[] by an outsider," *Olsen*, 312 F.3d at 1317—including, critically, heart and chest pain—Rife also displayed readily discernable signs that he needed medical care as the result of his motorcycle accident: there was "dried blood on [his] nose," and he appeared dizzy and confused, *Rife I*, 854 F.3d at 648; *see also Sealock v. Colorado*, 218 F.3d 1205, 1210 (10th Cir. 2000) (holding that prisoner presented sufficient evidence to demonstrate constitutional violation where prison guard failed to obtain medical care for him, despite fact that prisoner informed guard he believed he might be having heart attack and also "displayed symptoms consistent with a heart

16

attack"). Thus, we conclude that at the time of the alleged constitutional violation, existing circuit precedent would have "put a reasonable official" in Jefferson's position "on notice that his conduct was unlawful." *Weise*, 593 F.3d at 1167.

But this conclusion doesn't necessarily resolve the clearly-established question. That's because Jefferson asserts that "[e]ven assuming" there exists "on-point circuit precedent involving materially similar facts to this case and finding that the defendant . . . violated the Constitution, this [c]ourt's other precedents are so favorable to Jefferson's position that the law would still be unclear due to apparent contradictions in the precedent." Aplt. Br. 29–30.

In support, Jefferson cites a series of cases in which we have held that medical professionals didn't violate the Constitution by misdiagnosing prisoners. *See, e.g.*, *Self v. Crum*, 439 F.3d 1227, 1228, 1234 (10th Cir. 2006) ("At worst, the evidence shows [prison physician] misdiagnosed [inmate's] condition. But a misdiagnosis, even if rising to the level of medical malpractice, is simply insufficient under our case law to satisfy the subjective component of a deliberate indifference claim."); *Mata v. Saiz*, 427 F.3d 745, 750, 760–61 (10th Cir. 2005) (finding no constitutional violation where record demonstrated that prison nurse "made a good faith effort to diagnose and treat [prisoner's] medical condition" even though it was later determined that prisoner had indeed "suffered a heart attack"); *Sealock*, 218 F.3d at 1208, 1211 ("At worst, [prison nurse] misdiagnosed appellant and failed to pass on information to [another defendant] about appellant's chest pain. Appellant has failed

to show that [prison nurse] was deliberately indifferent to his serious medical needs.").

Jefferson's reliance on this line of authority is misplaced. As even he acknowledges, we held in *Rife I* that the "specialized" deliberate-indifference standards that apply to medical professionals don't apply to "laypersons such as [Jefferson]." 854 F.3d at 647; *see also Rohrbaugh*, 53 F.3d at 1183 (explaining law-of-the-case doctrine). And although Jefferson asserts that "[t]his development was unforeseen because neither this [c]ourt nor any other court of appeals had previously made such a distinction," he fails to identify any cases holding that a layperson may successfully assert a misdiagnosis defense to a deliberate-indifference claim. Indeed, we expressly noted the dearth of such cases in *Rife I*. *See* 854 F.3d at 647 ("We have not applied these [misdiagnosis] standards to deliberate indifference claims against laypersons such as police officers."). Thus, contrary to Jefferson's assertions, none of the misdiagnosis cases he cites "would have indicated to a reasonable officer" in Jefferson's position that his "conduct did not violate the Constitution." Aplt. Br. 33.

The same is true of the cases from outside our circuit that Jefferson cites in his brief. According to Jefferson, "it is difficult to see how even an on-point circuit precedent could render the law 'clearly established' if the same conduct in another circuit would be constitutional." Aplt. Br. 34 n.97. But even assuming the cases Jefferson cites suggest that other circuits might reach a different conclusion about the constitutionality of Jefferson's conduct in this case, "the decisions of one circuit court of appeals are not binding upon another circuit." *Garcia ex rel. Garcia v.*

18

*Miera*, 817 F.2d 650, 658 (10th Cir. 1987) ("To give preclusive effect to a conflict among the circuits" in context of clearly-established analysis "would effectively bind this circuit by the decisions of others. Moreover, the binding would always be in denigration of the constitutional right at issue."). Thus, to the extent that Jefferson suggests another circuit's cases can disestablish the clearly established law of *this* circuit, we disagree.[5] And in this circuit, it has been clearly established for more than a decade that when an arrestee not only informs an arresting officer of the internal symptoms of a serious medical condition but also displays outward signs of the need for medical attention, the arresting officer violates the Fourteenth Amendment by failing to seek such care. *See Olsen*, 312 F.3d at 1317; *Sealock*, 218 F.3d at 1210. Accordingly, Jefferson isn't entitled to qualified immunity, and we therefore affirm the district court's order denying his motion for summary judgment.

---

[5] Jefferson cites *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1868 (2017), for the proposition that "[w]hen the courts are divided on an issue . . . , a reasonable official lacks the notice required before imposing liability." But Jefferson appears to acknowledge that *Ziglar*'s pronouncement on this point isn't binding. Presumably that's because only four members of the Court joined this portion of the opinion. *See Texas v. Brown*, 460 U.S. 730, 737 (1983) (noting that such opinion isn't binding). Accordingly, we remain bound by *Garcia*'s pronouncement that, to the extent other circuits have held conduct like Jefferson's doesn't violate the Constitution, those decisions don't muddle our clearly established law. *See* 817 F.2d at 658; *see also Coriz ex rel. Coriz v. Martinez*, 915 F.2d 1469, 1470 n.2 (10th Cir. 1990) (reaffirming that "*Garcia* rule . . . applies to interjurisdictional conflicts"); *cf. Morfin v. Albuquerque Pub. Sch.*, 906 F.2d 1434, 1439 (10th Cir. 1990) ("*In the absence of contemporary Tenth Circuit precedent directly concerning the issue*, we may look to the law of other circuits when deciding whether or not a right was clearly established." (emphasis added)).

## II.    Willis and Dale

We turn next to the question of whether any of the cases that the district court cited below or that Rife identifies on appeal clearly establish that Willis' and Dale's conduct violated the Fourteenth Amendment.

First, for the reasons discussed above, we conclude that the district court erred in relying on *Barton*, 820 F.3d 958; *Marquez*, 543 F. App'x 803; *Marquez*, 2012 WL 12895017; and *Kraft*, 2005 WL 2042310. *See Haugen*, 543 U.S. at 200 n.4 (explaining that when judicial decisions "postdate the conduct in question," they are incapable of "giv[ing] fair notice" to government officials); *Estate of B.I.C.*, 761 F.3d at 1106 ("[D]istrict-court decisions . . . can be persuasive on the merits of a constitutional claim but cannot clearly establish what the law is."). Likewise, for the reasons discussed above, we conclude that to the extent *Olsen*, 312 F.3d 1304, and *Garcia*, 768 F.2d 303, involve findings of municipal liability, they are incapable of clearly establishing that Willis' and Dale's individual conduct here violated the Constitution.

Whether *Olsen*'s individual-individual liability discussion clearly establishes as much is a closer question. Like the plaintiff in *Olsen*, Rife verbally informed Willis and Dale of his internal discomfort: he "repeatedly complain[ed] of stomach pain" as Willis and Dale were moving him to the holding cell. *Rife I*, 854 F.3d at 652; *see also Olsen*, 312 F.3d at 1317 (noting that certain conditions have symptoms that are "more capable of being described by the sufferer than noticed by an outsider,"

20

and pointing out that plaintiff told arresting officer he was suffering from panic attack).

Nevertheless, we cannot say that *Olsen* places the constitutional question here "beyond debate." *Mullenix*, 136 S. Ct. at 308 (quoting *al-Kidd*, 563 U.S. at 741). Recall that when they booked him into the jail, Willis and Dale didn't know (or even have reason to suspect) that Rife had been thrown from his motorcycle, let alone that he might have suffered any internal injuries as a result. That's because when Jefferson delivered Rife to the jail for booking, "no one mentioned the motorcycle accident or said that [Rife] might have been injured." *Rife I*, 854 F.3d at 651. Thus, Willis and Dale knew only that Rife was suffering from stomach pain—a common malady that doesn't necessarily require any sort of immediate medical intervention. And we simply cannot say that *Olsen* would place every reasonable official in Willis' and Dale's position on notice that every detainee who entered the jail complaining of stomach pain (even "considerable" stomach pain, *Rife I*, 854 F.3d at 652 n.58), was constitutionally entitled to *immediate* medical treatment for that ailment. More importantly, unlike the arresting officer in *Olsen*—who apparently ignored the plaintiff's condition completely—Willis placed Rife on medical observation, a designation that "required jail personnel to check on [Rife] every [15] minutes." *Id.* at 641; *see also Olsen*, 312 F.3d at 1317. In light of this proactive conduct, we hold that *Olsen* doesn't place "beyond debate" the question of whether Willis and Dale were deliberately indifferent to Rife's serious medical needs. *Mullenix*, 136 S. Ct. at 308 (quoting *al-Kidd*, 563 U.S. at 741).

21

Thus, we agree with Willis and Dale: the district court erred in defining the right at issue here at too "high [a] level of generality." *Pauly*, 137 S. Ct. at 552 (quoting *al-Kidd*, 563 U.S. at 742). That is, the district court characterized the law as clearly established without first "identify[ing] a case where an officer acting under similar circumstances as [Willis and Dale] was held to have violated the [Eighth or Fourteenth] Amendment." *Id.* But that doesn't necessarily mean we must reverse. On appeal, Rife cites two additional cases in support of his assertion that Willis and Dale violated his clearly established rights: *Mata*, 427 F.3d 745, and *Sealock*, 218 F.3d 1205.

Yet in arguing that *Mata* and *Sealock* would have put reasonable officials in Willis and Dale's position on notice that their conduct violated his Fourteenth Amendment rights, Rife doesn't discuss the facts of either case. Thus, he necessarily fails to demonstrate that either case is "'particularized' to the facts" present here. *Pauly*, 137 S. Ct. at 552; *cf. Cox*, 800 F.3d at 1245 (citing "unique briefing burdens of the nonmovant plaintiff in the qualified-immunity context"). Nevertheless, we have sua sponte reviewed the facts of both cases, and we find them distinguishable.

First, to the extent that *Mata* and *Sealock* involved defendants who were medical professionals, *see, e.g.*, *Mata*, 427 F.3d at 750; *Sealock*, 218 F.3d at 1208, we held in *Rife I* that such cases don't establish the deliberate-indifference standards that apply to laypeople like Willis and Dale, *see Rife I*, 854 F.3d at 647, 651; *Rohrbaugh*, 53 F.3d at 1183 (explaining law-of-the-case doctrine). Thus, we conclude that *Mata*—a case in which all four defendants were medical

22

professionals—was therefore incapable of putting Willis and Dale on notice that their conduct violated the Fourteenth Amendment. *See* 427 F.3d at 750.

To the extent that two of the defendants in *Sealock* were also medical professionals, we reach the same conclusion. *See* 218 F.3d at 1208. But the other two defendants in *Sealock* were prison guards. *See id.* And as discussed above, we held that one of those guards violated the Eighth Amendment when (1) the plaintiff and his cellmate both informed the guard "that [the plaintiff] was or might be having a heart attack"; (2) the guard "was present when [the plaintiff] displayed symptoms consistent with a heart attack"; and (3) the guard nevertheless "refused to transport [the plaintiff] immediately to a doctor or a hospital." *Id.* at 1210–11.

*Sealock* clearly establishes that when an inmate or pretrial detainee complains of and displays symptoms consistent with a potentially life-threatening condition, a prison official who refuses the inmate's or detainee's request for medical treatment *and takes no other action* violates the Constitution. But that's simply not what happened here. Although Rife groaned and complained of stomach pain, he never suggested that his stomach pain was linked to injuries that might require—or even benefit from—immediate medical treatment. That's because Willis and Dale were unaware that Rife had been in a motorcycle accident, and therefore had no reason to link his stomach pain to a more serious condition. *Cf. Sealock*, 218 F.3d at 1208 (noting that inmate told guard that "he was having chest pain and might be having a heart attack"). Moreover, unlike the guard in *Sealock*, Willis took at least some action to ensure Rife's safety: he placed Rife on medical monitoring, *Rife I*, 854 F.3d at

23

651. In light of these distinctions, *Sealock* doesn't place "beyond debate" the question of whether Willis and Dale were deliberately indifferent to Rife's serious medical needs. *Mullenix*, 136 S. Ct. at 308 (quoting *al-Kidd*, 563 U.S. at 741).

In short, neither the cases the district court relied on below nor any of the cases that Rife cites on appeal clearly establish that Willis and Dale violated Rife's Fourteenth Amendment rights.[6] Accordingly, because Willis and Dale are entitled to qualified immunity, we reverse the portion of the district court's order denying their motion for summary judgment. *See Medina*, 252 F.3d at 1128.

**Conclusion**

We affirm the portion of the district court's order denying Jefferson's motion for summary judgment on qualified-immunity grounds. But because Rife fails to demonstrate that the law was clearly established as to Willis and Dale, they are entitled to qualified immunity. We therefore reverse the portion of the district court's

---

[6] Willis and Dale also argue that even assuming Rife identified a Tenth Circuit or Supreme Court decision that clearly established the contours of the right at issue, the constitutional question nevertheless wouldn't be "beyond debate" because the district court in this case "initially found that [their] acts or omissions did not violate the Constitution." Aplt. Br. 43. Because we agree with Willis and Dale that Rife fails to identify such a case, we need not reach this argument.

order denying their motion for summary judgment and remand with instructions to grant summary judgment in their favor.

Entered for the Court


Nancy L. Moritz
Circuit Judge

25